IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| THE NEW ALLIANCE GROUP, LLC, and VENSURE EMPLOYER SERVICES, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>KELLY DETLEFSEN, AMY KNOBBE[1], JASON HAAKE, CHARLES POST, TAYLOR STORMBERG, and PANDO,<br><br>Defendants. | 8:23CV88<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on a Motion for Preliminary Injunction (Filing No. 32).[2] Plaintiffs The New Alliance Group ("Alliance") and Vensure Employer Services, Inc. ("Vensure" and collectively "plaintiffs") assert six causes of action: (1) breach of contract against defendants Kelly Detlefsen ("Detlefsen"), Amy Knobbe ("Knobbe"), Jason Haake ("Haake"), Charles Post ("Post") and Taylor Stormberg ("Stormberg" and collectively "defendants"); (2) breach of fiduciary duty against Detlefsen, Knobbe, Haake, Post, and Stormberg; (3) breach of covenant of good faith and fair dealing against Detlefsen, Knobbe, Haake, Post, and Stormberg; (4) misappropriation of trade secrets in violation of Nebraska Revised Statutes § 87-501 against Detlefsen, Knobbe, Haake, Post, and Stormberg; (5) civil conspiracy against all defendants; (6) tortious interference with contract against all defendants.

---

[1]In their complaint (Filing No. 1), the plaintiffs refer to both "Amy Guerra" and "Amy Knobbe," identifying the latter as a member of Pando, which is itself identified by a purported trade name and described as both a Nebraska corporation (caption) and a Nebraska limited liability company (allegations). In the defendants' answer and third-party complaint, Amy Guerra stated she is now correctly known as Amy Knobbe. (Filing No. 50). The Court will refer to her as such, but defendant is directed to amend the complaint and caption to clarify the issue.

[2]This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

The plaintiffs seek to force the defendants to destroy all copies of trade secrets, and direct that they return and cease using their confidential information. The plaintiffs also seek to restrict defendants from contacting or soliciting any entity which was a client of plaintiffs while defendants were in the plaintiffs' employ.

Also before the Court is defendants' Motion to Strike (Filing No. 44) pursuant to Federal Rule of Civil Procedure 12(f). In the alternative, the defendants request the Court allow a surreply in opposition to the plaintiffs' initial reply brief (Filing No. 41).

## I. BACKGROUND

### A. Employment Status and Acquisition by Vensure

Alliance describes itself as a Professional Employer Organization ("PEO"). (Filing No. 37-5 ¶ 4).[3] A PEO provides human-resource, payroll, and employee-benefits services to other companies. (Filing No. 1 ¶ 4). On December 28, 2021 Vensure acquired another PEO, The Alliance Group (Alliance). (Filing No. 1 ¶ 5-6). Vensure provides PEO services to companies as well. (Filing No. 1 ¶ 10).

Detlefsen, Knobbe, Haake, and Stormberg are all former Alliance and Vensure employees who reside in Omaha, Nebraska. (Filing No. 1 ¶ 11-13, 15). Post is a former Alliance and Vensure employee who resides in Centennial, Colorado. (Filing No. 1 ¶ 14).

Pando PEO ("Pando") is a Nebraska limited-liability company with its principal office in Omaha, Nebraska and has three members: Knobbe, Stormberg, and Tetrad Corporation. (Filing No. 1 ¶ 16-17). Pando provides the same or substantially similar services as Alliance (Filing No. 1 ¶ 20).

---

[3]Alliance is owned by Vensure Employer Services. During Vensure's acquisition of Alliance, Vensure acquired Alliance's employees and clients. Since Alliance remains an active entity, the Court will refer to it throughout the order even though it is a subsidiary of Vensure.

To catalog and manage Alliance and Vensure information the plaintiffs used Microsoft SharePoint (the "database") to host the information online. (Filing No. 37-1 ¶ 19). The database housed client contact information, client implementation information, benefits information, sales information, connection information, and tax information. *Id*. The plaintiffs claim their Health Plan and Rate Tables (also on the database) were confidential, customized terms and rates negotiated between the plaintiffs and Blue Cross Blue Shield ("Blue Cross").[4]

When Vensure acquired Alliance, Detlefsen, Knobbe, Haake, Post, and Stormberg became and were retained as Vensure employees. (Filing No. 1 ¶ 18-20). On May 5, 2022, Stormberg and Knobbe had retained the Goosmann Law Firm to provide advice on business formation and confidentiality and non-compete issues. (Filing No. 33 ¶ 38). Stormberg used Alliance's copy machine to scan and send a signed copy of his attorney's "Engagement Agreement." *Id*. On June 9, 2022, Stormberg received an email from Detlefsen with the Alliance's Health Plan and Rate Tables attached. (Filing No. 33 ¶ 39). Alliance remains an active entity.

On June 16, 2022 Stormberg contacted Vicki Shank ("Shank") of Dynamic Fusion, Inc. ("Dynamic Fusion"). (Filing No. 33 ¶ 40). Dynamic Fusion was a potential client of Alliance and Michael Mapes ("Mapes") asked Stormberg to provide them an estimate for Alliance's services. *Id*. According to Shank, Stormberg did not provide an estimate to Dynamic Fusion but told Shank that he would be in touch soon regarding a new PEO option. *Id*.

On June 27, 2022, Stormberg used his Alliance email address to contact Tim Brotzki of Omaha Sports Academy ("OSA") to request a meeting. (Filing No. 33 ¶ 44). OSA was an Alliance client when Stormberg met with OSA on July 12. *Id*. After the

---

[4]Plaintiffs assert the insurance rates and terms of coverage are important in attracting and keeping clients. (Filing No. 34-1 ¶ 17). The Health Plan and Rate Tables represent prices Blue Cross had previously agreed to. (Filing No. 34-1 ¶ 18-19).

3

defendants left Vensure, OSA terminated its contract with the plaintiffs and signed with Pando.

Knobbe left Alliance on June 30, 2022. (Filing No. 37-2 ¶ 65). Alliance terminated Stormberg's employment in the middle of July 2022. (Filing No. 1 ¶ 92). Haake ended his employment with Alliance July 18, 2022. (Filing No. 37-3 ¶ 21). Detlefsen ended her employment with Alliance August 12, 2022. (Filing No. 37-1 ¶ 6).

In July 2022, while still employed by the plaintiffs, Knobbe and Stormberg established Pando, a competitor to Alliance. (Filing No. 1 ¶ 21-23). Detlefsen, Haake, and Post all were hired by Pando after they ceased working for Alliance. (Filing No. 1 ¶ 24).

Currently, Pando has twenty-eight clients who were formerly affiliated with Alliance. (Filing No. 1 ¶ 24-25). All of those former clients notified Alliance of their departures in the final two months of 2022. (Filing No. 1 ¶ 26). The plaintiffs have asserted that the loss of these clients has already cost Alliance over $500,000 in administrative fees, over $4,500,000 in future administrative fees, and over $6,000,000 in lifetime client valuation. (Filing No. 1 ¶ 27-28).

## B. Restrictive Covenants

Detlefsen, Knobbe, Haake, and Stormberg all signed what the Court will refer to as to as non-compete clauses (hereinafter "non-compete"). The language is as follows:

> "[D]uring the term of [the] Agreement, and for a period of six (6) months thereafter [employee] shall not directly or indirectly individually or as a partner, shareholder, principal, EMPLOYEE, agent, officer, director, investor, manager, trustee, solicitor, representative, account executive, counselor or in any other capacity, participate or engage in any business competing with the business of the EMPLOYER, or other similar business service previously marketed for the EMPLOYER; or any similar business, without the prior written consent of EMPLOYER. Upon termination of this Agreement, the foregoing restrictions shall be applicable to a geographic

area consisting of a radius of fifty (50) miles from the office in which EMPLOYEE worked hereunder on the effective date of termination of this Agreement." (Filing No. 1 ¶ 31).

The same defendants agreed to what the Court will refer to as non-solicitation clauses (hereinafter "non-solicitation of customers"). The language is as follows:

"Upon termination of this Agreement, EMPLOYEE shall not . . . for a period of twelve (12) months from the effective date of this Agreement . . . contact or solicit the business of any person, . . . client, . . . or prospective client of EMPLOYER whom EMPLOYEE, or any other office in which EMPLOYEE was working hereunder, had contacted or solicited during the period of twenty-four (24) months prior to said effective date of termination." (Filing No. 1 ¶ 31(c)) (second alteration added.)[5]

Post signed a Branch Revenue Sharing Agreement which stated he would not directly or indirectly solicit or assist in soliciting in competition with the company. This hereinafter will be referred to as the "Post Non-Solicitation Agreement." The language is as follows:

"Manager acknowledges and recognizes the highly competitive nature of the business of the Company and accordingly agrees that during the Term and, for a period of (1) year following the termination of this Agreement for any reason (the "Restricted Period"), Manager will not, whether on Manager's own behalf or on behalf of or in conjunction with any Person, directly or indirectly solicit or assist in soliciting in competition with the Company: (i) the business of any client or prospective client with whom Manager had personal contact or dealings on behalf of the Company during the Term; or (ii) any employee of the Company to leave the employment of the Company." (Filing No. 1 ¶ 70(c)).

---

[5]This provision does restrict the solicitation of employees which may be enforceable against defendants. Any remedy would likely be limited to monetary damages. The Court cannot order Pando to fire any former Alliance employees.

### C. Confidentiality Provisions

Detlefsen, Knobbe, Haake, and Stormberg signed substantially identical confidentiality clauses (hereinafter "confidentiality clause"). The language is as follows:

> "That all trade secrets, . . . customer lists, . . . and other information obtained or developed by EMPLOYEE in the course of employment with EMPLOYER are confidential and shall remain the exclusive property of EMPLOYER. Inasmuch as EMPLOYEE will, during the course of [her] employment hereunder acquire from EMPLOYER such confidential information, EMPLOYEE agrees that [she] shall not, during the term of this Agreement, retain or make copies of, disclose, use or remove from the office. . . any trade secrets . . . or other confidential information concerning the business of EMPLOYER except that which is necessary and required by [her] employment hereunder. Upon termination of this Agreement, EMPLOYEE shall not . . . retain or use copies of any of the foregoing." (Filing No. 1 ¶ 31(b)).

The Branch Revenue Sharing Agreement Post signed included a confidentiality clause as well. This will be referred to as "Post Confidentiality Clause." The language is as follows:

> "Manager will not at any time (whether during or after the Term) (A) retain or use for the benefit, purposes or account of Manager or any other . . . business organization, entity or enterprise . . . other than the Company; or (B) disclose, divulge, reveal, communicate, share, transfer or provide access to any Person outside the Company (other than its professional advisers who are bound by confidentiality obligations) any non-public proprietary, proprietary or confidential information–including without limitation trade secrets, know-how, . . . information concerning . . . pricing, costs, products services, vendors, customers, [and] clients . . . concerning the past, current or future business, activities and operations of the Company, its subsidiaries or affiliates and/or any third party that has disclosed or provided any of the same to the Company on a confidential basis ("Confidential Information") without the prior written authorization of the Company." (Filing No. 1 ¶ 70(a)).

## II.  DISCUSSION

### A.  Motion to Strike

Generally, new legal arguments brought up for the first time in a reply brief are improper. *See Akeyo v. O'Hanlon*, 75 F.3d 370, 374 n.2 (8th Cir. 1996). If new information in the reply brief is not relied upon, it can be ignored or if new information is needed to address factual or legal issues in the opposing brief, that new evidence can be allowed. NECivR. 7.1(c)(1). Finally, the Court may allow arguments raised in the reply brief if they merely supplement arguments raised in a parties' initial brief. *See United States v. Head*, 340 F.3d 628, 630 n. 4 (8th Cir. 2003).

Defendants move to strike the Declarations of Jeff Neary ("Neary") and Jim Vokal ("Vokal") and Shank (Filing No. 44). Defendants assert plaintiffs' declarations are not in reply to anything discussed in the defendants' declarations or argued in their brief in opposition to the motion for injunction. These declarations are offered to rebut the defendants' claim that "[w]hile with Alliance, [they] did not solicit any New Alliance customers to switch to Pando." Shank says she was solicited by Stormberg while he was still employed by Alliance.

The last request was to strike the second declaration of Mapes. Mapes' statements directly address what he views as inaccurate in the defendants' declarations. Since most of his statements are intended to simply rebut defense claims, the motion to strike is denied as is the motion seeking leave to file a surreply. The declarations will be given the weight they deserve in the context of the motion.

The information provided in the declarations does not directly affect the Court's basis for denying injunctive relief.

7

B.  **Motion For Preliminary Injunction**

The plaintiffs seek a preliminary injunction against the defendants. A preliminary injunction may be used only on notice to the adverse party pursuant to Federal Rules of Civil Procedure 65(a)(1).

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing. *Ramaekers v. Creighton Univ.*, 978 N.W.2d 298, 307 (2022); (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, (1981)).

When deciding whether to issue a preliminary injunction, this Court considers the four factors set forth in *Dataphase Systems., Inc. v. C L Systems., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). The factors are: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties' litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023). No single factor is determinative. *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1015 (8th Cir. 2020). The movant bears the burden of establishing the propriety of the injunction. *Id*. A preliminary injunction is an extraordinary remedy and is rarely granted. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

1.  **No Likelihood of Success on the Merits**

Of the four factors courts consider in deciding whether to afford injunctive relief, "likelihood of success on the merits is most significant." *S & M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992). To satisfy this factor, the plaintiffs must show they have a "fair chance of prevailing" at trial. *D.M. v. Minn. State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019). "This fair-chance standard does not require

the party seeking relief to show a greater than fifty percent likelihood that he will prevail on the merits." *Id.*

The plaintiffs discuss five causes of action in the context of the motion for preliminary injunction.[6] The Court will address each in turn.

### a. Breach of Contract

The plaintiffs assert Detlefsen, Knobbe, Haake, Post, and Stormberg breached their non-compete clauses and assert Knobbe, Post, and Stormberg breached their non-solicitation clauses.[7] The plaintiffs' main focus is on the non-solicitation clauses but this section will explain why they need to be taken together. Additionally, the plaintiffs allege Detlefsen and Stormberg violated their confidentiality clauses. All parties agree that Nebraska law controls.

To be enforceable, such clauses must be reasonable in their duration and scope. *See Aon Consulting, Inc. v. Midlands Fin. Benefits, Inc.*, 748 N.W.2d 626, 653 (Neb. 2008). Such clauses must meet three general standards: "(1) not be injurious to the public; (2) [be] no greater than reasonably necessary to protect the employer in some legitimate business interest; and (3) not [be] unduly harsh and oppressive on the party against whom it is asserted." *Id.* (alteration in original).

---

[6]The plaintiffs raise a sixth cause of action in their initial complaint, a breach of fiduciary duty. Because the plaintiffs do not specifically argue breach of fiduciary duty as a basis for preliminary injunctive relief the Court will not consider it for purposes of this motion. As part of the fiduciary duty claim the plaintiffs also makes reference to a breach of duty of loyalty but did not address it in its preliminary injunction submission. Because the plaintiffs do not directly address the duty of loyalty claim as part of this motion, the Court will not consider the claim here.

[7]The evidence provided to sustain the alleged non-solicitation breach by Post is the mere assertion of ten clients leaving "around the same time" as Post left and his "inability to provide a categorical denial." (Filing No. 41). What the plaintiffs have provided does not suggest a likelihood of success on the merits. There is a lack of evidence presented to show Post breached the non-solicitation clause in the Branch Revenue Sharing Agreement, even if it were enforceable.

In applying the reasonableness requirements, the last two are the most important. Alliance's non-compete clause restricted the employee for six months within a fifty-mile radius. The clause stopped the employee from participating or engaging in "any business competing with the business of the employer or other similar business service previously marketed for the employer, or any similar business without the consent of the employer." This clause is clearly invalid under Nebraska law because it is overly broad, greater than reasonably necessary, and unduly harsh. *See Gaver*, 856 N.W.2d at 127.

Under Nebraska law, non-compete and non-solicitation clauses are not automatically enforced. *See Gaver v. Schneider's O.K. Tire Co.*, 856 N.W.2d 121, 129 (Neb. 2014); *Aon Consulting, Inc.*, 748 N.W.2d at 653 (holding an "employer has a legitimate business interest in protection against a former employee's competition by improper and unfair means, but that an employer is not entitled to protection against ordinary competition from a former employee.

A garden variety non-compete clause, like the ones at issue here are never enforceable against a former employee under Nebraska law. *Presto-X-Co. v. Beller*, 568 N.W.2d 235, 238 (Neb. 1997) (holding Nebraska courts have narrowly defined the permissible scope of covenants not to compete contained in employment agreements).

The non-solicitation of customers clause is likely also unenforceable under Nebraska law. *See Pro. Bus. Servs., Co. v. Rosno*, 589 N.W.2d 826, 831 (Neb. 1999) (finding a non-compete "may be valid only if it restricts a former employee from working for or soliciting the former employers' clients or accounts with whom the former employee actually did business and had personal contact"). The non-solicitation of customers clause is not narrowly limited to just former accounts with whom the individual employee had personal contact and did business. *Id.*

The non-solicitation of customers clause here was limited to twelve months from the "effective date of this agreement." The defendants assert that the effective date for all

10

three agreements was the date of execution rather than the date of termination. Other parts of the agreements state they are enforceable through the specified months *after* the "effective date of termination." It appears that there may be issues as to whether the twelve-month period has elapsed when employment ended for the individual defendants.

Significantly, Nebraska courts do not employ the "blue pencil rule" to amend or strike non-enforceable provisions. *CAE Vanguard,* 518 N.W.2d 652, 655 (Neb. 2008). "The 'blue pencil rule' allows a court to strike an unreasonable restriction from a covenant if, after its removal, the covenant remains grammatically meaningful." *Id*. In Nebraska the text of such agreements cannot be changed. *See Waadah*, 861 N.W.2d at 441. Even if the Court found non-solicitation of customers clauses were enforceable on their face, it would not lead to a favorable outcome.

Even if the non-solicitation of customers clause was enforceable on its face, it would likely fail due to the combination with the non-compete language. The severability clause embedded in the covenants provides no cover for the plaintiffs. Alliance employment contracts included a section which stated, "in the event any portion of this Agreement shall, for any reason, be held invalid or unenforceable, it is agreed that the same shall not affect any other portion of this Agreement" (Filing 1 Exhibit A ¶ 7). Nebraska Courts have held that merely including a severability clause with a non-compete will not actually sever it from the rest of the agreement, meaning the non-solicitation section is still invalid. *CAE Vanguard*, 518 N.W.2d at 655; *H & R Block Tax Servs., Inc. v. Circle A Enters., Inc.*, N.W.2d 548, 551 (Neb. 2005) (holding a non-compete clause and a non-solicitation clause were part of a single integrated covenant not to compete and that if one part of the restriction on post-termination competition is invalid the other is likewise invalid).

On this record, the plaintiffs are unlikely to succeed at trial on their restrictive covenant claims.

11

Conversely, the confidentiality clause claims against Detlefsen and Stormberg may succeed if the plaintiffs can prove the emails containing company information were a breach.

### b. Good Faith

The plaintiffs claim Detlefsen, Knobbe, Haake, Post, and Stormberg violated an implied covenant of good faith and fair dealing by using their positions to undermine Alliance. *RSUI Indem. Co. v. Bacon*, 810 N.W.2d 666, 674-75 (Neb. 2011) (concluding "the implied covenant of good faith and fair dealing exists in every contract and requires that none of the parties to the contract do anything which will injure the right of another party to receive the benefit of the contract"). "Acting according to the express terms of a contract is not a breach of good faith and fair dealing." *Terry A. Lambert Plumbing Inc. v. W. Sec. Bank*, 934 F.2d 976, 983 (8th Cir. 1991) (applying Nebraska law).

The plaintiffs assert the defendants sabotaged the plaintiff's business during and after employment. The plaintiffs claim the defendants "thwarted the plaintiffs' reasonable expectations by siphoning away the plaintiffs' customers and developing a competing enterprise." (Filing No. 33 ¶ 1.2). As noted above, ordinary competition cannot be limited.

The plaintiffs want the Court to enforce the non-compete and non-solicitation provisions of their contracts with defendants and largely base their good faith claims on the largely unenforceable provisions. Because the non-compete and non-solicitation provisions are invalid under Nebraska law there is no duty of good faith, relating to invalid provisions of a contract.[8] *Spanish Oaks, Inc. v. Hy-Vee, Inc.*, 655 N.W.2d 390, 400 (Neb. 2003) (holding a violation of the duty of good faith occurs only when a party violates, nullifies, or significantly impairs any benefit of a valid contract).

---

[8]The confidentiality provision evidence is not sufficient to support a preliminary injunction, but it does not automatically suffer the same fate at this time, as the non-solicitation and non-compete provisions.

### c. Trade Secrets

A "trade secret" is defined under the Nebraska Trade Secrets Act as information: "(a) derives independent economic value, actual or potential, from not being known to, and not being ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Neb. Rev. Stat. 87–502(4).

The elements necessary to establish a cause of action for misappropriation of a trade secret are:

> "(1) the existence of a trade secret, (2) the value and importance of the trade secret to the employer in the conduct of his business, (3) the employer's right by reason of discovery or ownership to the use and enjoyment of the secret, and (4) the communication of the secret to the employee while he was employed in a position of trust and confidence and under circumstances making it inequitable and unjust for him to disclose it to others or to use it himself to the employers' prejudice." *Richdale Dev. Co. v. McNeil Co.*, 508 N.W.2d 853, 859 (Neb. 1993).

Information known generally by the public or by people in the specific industry is not protectable as a trade secret. *Id.* Thus, "[a] trade secret must be a particular secret of the complaining employer and not the general secrets of the trade in which the employer is engaged." *Selection Research, Inc. v. Murman*, 433 N.W.2d 526, 532 (Neb. 1989).

Customer information can qualify as a trade secret if "time and effort have been expended to identify particular customers with particular needs or characteristics." *Home Pride Foods v. Johnson*, 634 N.W.2d 774, 782 (Neb. 2001). There needs to be information beyond what is publicly available such as "mere identities and locations of customers that anyone could easily identify as possible customers." *Id*.

The plaintiffs' claim customer information qualifies as a trade secret because Alliance expended time and effort to identify their customers. The plaintiffs claim the database is not just stocked with readily available lists, but includes particular client

needs and characteristics in the database as well. The plaintiffs assert the Health Plan and Rate Tables are trade secrets.

The plaintiffs primarily rely on Detlefsen's disclosure of the Health Plan and Rate Tables to Stormberg and claim there was no legitimate business reason for the disclosure. Finally, the plaintiffs claim that the copy of the plan and tables were then used to unfairly compete with the plaintiffs.

The Health Plan and Rate Tables are two of the three alleged trade secrets. Plaintiffs claim that both documents were confidential, and they took measures to preserve that confidentiality. (Filing No. 1 ¶115-117). Plaintiffs claim the information was valuable because they invested time and money negotiating the terms of the documents with Blue Cross. Based on the specific prices and compilations it would be easy to see how a competitor could use this information to undercut Alliance. Under *Johnson*, the Health Plan and Rate Tables are examples of two sources of information which could qualify as trade secrets.

The third claimed trade secret is the client database. This database contained information about the costs and payments associated with the clients and was not public information. It was protected as only employees with relevant duties could view it. The database is similar to the other trade secrets in that it has value to competitors. Should they have access, it would make it much easier to compete with Alliance and target its' clients. That is what the plaintiffs claim happened here.

There is a dispute over whether a salesman, like Stormberg, would usually have access to any of this information as part of his duties. The plaintiffs say he should not have needed it. Stormberg claims he used it in the natural function of his duties. That assertion may be undermined because Stormberg could not access the rates and tables directly. Stormberg requested the information from a co-worker instead of accessing it

himself. The logical conclusion is that he does not or should not have access to the information during the normal course of his duties.

The plaintiffs would also have to show that the passage of time has not rendered the rates and tables outdated.

### d. Civil Conspiracy

The plaintiffs assert all the defendants engaged in a civil conspiracy for their actions leading up to their departure and during their employment at Pando. Under Nebraska law, "a civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means." *W. Plains, L.L.C. v. Retzlaff Grain Co. Inc.*, 870 F.3d 774 (8th Cir. 2017) (quoting *Peters v. Woodman Accident & Life Co.*, 104 N.W.2d 490, 496 (Neb. 1960)). The co-conspirators must expressly or impliedly agree to commit an unlawful act, and one of them must "actually commit some underlying conduct." *Id*.

The plaintiffs claim that individual defendants coordinated with one another to breach their contractual and fiduciary duties and misappropriate plaintiffs' trade secrets.[9] They point to emails, text messages and other communications such as an email from Detlefsen to Stormberg that attached the Health Plan and the 2022 Rate Tables. There needs to be a tortious act to support a civil conspiracy claim. *deNourie & Yost Homes, LLC v. Frost*, 854 N.W.2d 298, 316 (Neb. 2014) (A conspiracy is not a separate and independent tort in itself; rather, it depends upon the existence of an underlying tort). The evidence presented cannot sustain a preliminary injunction.

---

[9]The contractual duties include the non-solicitation, non-compete, and confidentiality clauses included in their respective employment contracts previously discussed.

15

### e. Tortious Interference

The plaintiffs lastly assert all the defendants interfered with plaintiffs' business relationships by soliciting current clients, notably before employment was terminated in some cases. To succeed on a claim for tortious interference with a business relationship under Nebraska law, a plaintiff must prove (1) the existence of a valid business relationship or expectancy; (2) the defendant had knowledge of the relationship or expectancy; (3) the defendant committed an unjustified intentional act of interference with the relationship; (4) causation; and (5) damages. *See Denali Real Est., LLC v. Denali Custom Builders, Inc.,* 926 N.W.2d 610, 627 (Neb. 2019). To constitute actionable interference with an employment relationship, the actions of a co-employee must have been committed in furtherance of some purpose other than the lawful purposes of the employer. *See Huff v. Swartz*, 606 N.W.2d 461, 468 (Neb. 2000). Such interference must be "unjustified" to be actionable. *Id*.

The plaintiffs will have to prove causation. *Denali Real Est.*, 926 N.W.2d at 627. Even if the meetings occurred and the clients eventually departed, that may not be enough on its own. While still employed with Alliance, Stormberg told Shank of Dynamic Fusion that he would "be in touch soon" with a different PEO option, Pando. (Filing No. 33 ¶ 40). If proven, that could violate his duty of good faith. *See Swartz*, 606 N.W.2d at 468.

The plaintiff's allegations support the first two elements, but the final three elements prove more challenging. The plaintiffs assert Stormberg could have interfered with their relationship by performing duties unrelated to his position. Alliance hired him as a salesman, so his job duties would be to solicit and maintain business for the plaintiffs. The plaintiffs' highlight many circumstances where Stormberg would take meetings with current or prospective clients that were atypical.

16

### C. Threat of Irreparable Harm

Whether or not there is a likelihood of success on the merits for some claims, the plaintiffs have failed to show that they will likely suffer irreparable harm if the Court does not enjoin the defendants from soliciting its clients. The plaintiffs ask the Court to issue the injunction for four issues.

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Grasso Ents., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016). To warrant an injunction, "the movant must show that irreparable injury is likely in the absence of an injunction, not merely a 'possibility' of irreparable harm before a decision on the merits can be rendered." *Winter,* 555 U.S. at 22.

The loss of intangible assets like goodwill and business reputation can constitute irreparable harm because the damages resulting from these losses are not readily ascertainable. *See Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) (explaining harm to reputation and goodwill can be extremely difficult to quantify in terms of dollars); *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) (concluding damage to reputation often cannot be remedied with money damages, so the mere threat of reputational harm may constitute irreparable harm).

First, the plaintiffs request the defendants destroy all copies of the Blue Cross Health Plan and Rate Tables that are in the defendants' possession. Second, the plaintiffs seek to enjoin the defendants from using this information to aid Pando. Third, the plaintiffs want to force the defendants confirm in writing and under penalty of perjury that each defendant has and will adhere to an order from the Court on the first two counts. Finally, the plaintiffs want to stop Pando from contacting or soliciting any current Alliance client.

With respect to the first request by the plaintiffs, the Court looks at how the information at issue can be used in the future for purposes of a preliminary injunction. With the Blue Cross Health Plan, there is nothing that can be done if the information was *already* used as plaintiffs allege. The information may have provided an advantage to Pando in negotiating their own rates, but since Pando is providing services now, they must already have their Health Plan set up. If the defendants used the Health Plan as a tool to negotiate as plaintiffs suggest, then the proper remedy is damages, not an injunction.

The second request is similar to the first. Pando is up and running so at this point they have their own health plan and rate tables. Any value they could have had from the plan and tables from Alliance has possibly run its course.

Next, the plaintiffs ask the Court to force the defendants to "confirm in writing and under penalty of perjury" that each defendant has and will adhere to the Court's order which is beyond any potential remedy the Court would order.

Finally, the plaintiffs want to stop Pando from soliciting or contacting current clients. That is asking the Court to limit the business opportunities of third parties not before the Court. This ask by the plaintiffs is overly broad and goes beyond those companies that the defendants may have worked with directly.

Since the plaintiffs claim to know who was allegedly poached, they can identify potential damages, as the plaintiffs have indicated in complaint. When money damages are available, an injunction is not favored. *See Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (deciding a lack of irreparable harm alone is a sufficient ground to deny a preliminary injunction). The Court cannot turn back the clock or dictate to the thirty-two businesses who left Alliance to Pando where they can go.

If the Plaintiffs are able to prevail on any of their claims, they will be entitled to seek damages.[10] The return of clients cannot be ordered as part of the motion on the merits. The Eighth Circuit held that purely economic loss "is not an irreparable injury as long they can be recovered." *DISH Network Serv. L.L.C. v. Laducer*, 725 F.3d 877, 882 (8th Cir. 2013). In light of the fact that any such damages can be remedied this element is not met.

### D. Balance of Equities

The Court must also compare the threat to each of the parties' rights that would result from granting or denying the injunction. *See Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994). It also must consider the potential economic harm to each of the parties and to interested third parties. *Id*.

The equities here are generally neutral. On the one hand, there is value in protecting business relationships and secrets. The plaintiffs attempt to characterize their motion as a way to stop defendants from "poaching" their current clients. The defendants see it as the plaintiffs attempting to stifle competition. This element does not tip the scales in either direction.

### E. Public Interest

"The Eighth Circuit has repeatedly acknowledged that the public interest favors protecting the freedom to contract by ensuring enforcement of contractual rights and obligations." *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1145 (8th Cir. 2007).

The non-compete and non-solicitation clauses are likely not valid or enforceable under Nebraska law. The Nebraska Courts have indicated it is not in the interest of the public to enforce non-competes or overly restrictive covenants. See *Aon Consulting*, 748

---

[10] Even if the plaintiffs can succeed on any of their non-compete, the non-solicitation, and the breach of confidentiality claims, the Court notes that paragraph six of the Employment Agreements contains a liquidated damage provision that limits violations of ten thousand dollars.

19

N.W.2d at 653. The public interest is in favor of open competition. Here the freedom of clients to shop for competing PEOs needs to be weighed as well.

On the other hand, protecting trade secrets and the confidentiality of information is an important factor to consider that would tilt back to the plaintiffs. Overall, the public interest will not dislodge the more-salient factors as at most, this element is neutral.

### III. CONCLUSION

With regard to the declarations in the reply brief (Filing No. 41), the Court finds that the declarations were permissible and will deny the motion to strike.

Plaintiffs have provided little evidence that they are likely to succeed on the merits of their many claims for the purposes of a preliminary injunction. The non-compete and non-solicitation of customers clauses are unenforceable and the timeframe they were protecting has elapsed. The plaintiffs have not shown they would suffer irreparable harm. The first two *Dataphase* factors tilt toward the defendants and the last two are neutral. On the record, plaintiffs have not met their burden of demonstrating the need for preliminary injunctive relief.

IT IS ORDERED:

1. Kelly Detlefsen, Amy Knobbe, Jason Haake, Charles Post, Taylor Stormberg and Pando PEO's Motion to Strike (Filing No. 44) is denied.

2. The New Alliance Group and Vensure Employer Services' Motion for Preliminary Injunction (Filing No. 32) is denied.

Dated this 26th day of July 2023.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge